Filed 1/21/21  P. v. Garcia CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JORGE JAVIER GRACIA,<br><br>　　　Defendant and Appellant. | F078374<br><br>(Super. Ct. No. F18903995)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Jorge Javier Gracia was convicted of six counts of assault with a semiautomatic firearm, five counts of shooting at an occupied vehicle, brandishing a firearm, multiple counts of illegal possession of firearms and ammunition, possession of a controlled substance with a firearm, and possession of a controlled substance. He argues the trial court erroneously denied his post-trial motion, under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), seeking substitute counsel for purposes of filing a new trial motion. He requests a remand with directions to the trial court to grant his *Marsden* motion and appoint substitute counsel for purposes of preparing and filing a new trial motion. He also challenges his sentence, arguing the trial court improperly denied his *Romero* motion, in which he asked the court to strike one or both of his two prior strike convictions for sentencing purposes. (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.) We affirm.

## PROCEDURAL HISTORY

On July 5, 2018, the Fresno County District Attorney charged Gracia, by information, with six counts of assault with a semiautomatic firearm, with personal-use firearm enhancements attached to each count (Pen. Code,[1] §§ 245, subd. (b), 12022.5, subd. (a); counts 1-6); five counts of shooting at an occupied motor vehicle (§ 246; counts 7-11); one count of brandishing a firearm at a person in a motor vehicle, with a personal-use firearm enhancement attached (§§ 417.3, 667, 1192.7; count 12); two counts of possession of a firearm by a felon (§ 29800, subd. (a)(1); counts 13-14); three counts of unlawful possession of ammunition (§ 30305, subd. (a)(1); counts 15-17); one count of possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 18), and one count of possession of a controlled substance with a prior controlled substance conviction (Health & Saf. Code, § 11377, subd. (a); count 19). The information further alleged that Gracia had two prior serious felony convictions (§ 667,

---

[1]    Subsequent statutory references are to the Penal Code unless otherwise specified.

subd. (a)), which also counted as prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).

On October 5, 2018, a jury convicted Gracia on all counts and found all firearm enhancement allegations true. Gracia admitted the prior conviction enhancement allegations. On November 5, 2018, the trial court denied Gracia's *Romero* motion, and sentenced him to a determinate term of 130 years, followed by an indeterminate term of 224 years to life, for an aggregate term of 354 years to life in prison.

## FACTS

**A.     Five Shootings at Occupied Vehicles (November 27, 2017 to December 15, 2017)**

### *(1)     November 27, 2017 Shooting:  Patricia M. and Her Baby*

On the evening of November 27, 2017, Patricia M. parked her Ford Focus sedan on the side of California Avenue in Fresno County; her nine-month-old son was sleeping in a car seat in the back of the car. A few seconds after she pulled back onto California Avenue, Patricia heard a loud bang. As she attempted to figure out what had happened, she looked in her rearview mirror and saw a large, dark-colored, square-topped vehicle traveling in the opposite direction. It was dark and Patricia could not see very well; she surmised the vehicle was possibly a Chevy Suburban. The vehicle had passed by her car, following another car, at the time she heard the loud bang.

When Patricia got home, she examined her car and saw a bullet hole in the back bumper, on the driver's side. Eventually, she called the police; officers came to inspect her car. Officers determined a bullet had landed in the interior of the bumper; the bullet was retrieved at a body shop.[2]

---

[2]     This incident gave rise to two counts of assault with a semiautomatic firearm because both Patricia and her son were in the car.

3.

### (2) December 4, 2017 Shooting: Ronald B.

On December 4, 2017, between 4:00 p.m. and 4:30 p.m., Ronald B. was driving his Chevy Malibu northbound on Highway 145 when he heard a loud bang. After a few seconds, he realized it was a gunshot, and he pulled over on the side of the road. He looked back and saw that his rear driver's side window was shattered and his backseat had a bullet hole in it. He called 911 to report the shooting but did not have a description of the vehicle that passed by when his car was shot.

Law enforcement officers arrived and examined Ronald's car. They were unable to retrieve the bullet with the tools they had with them. A few days later they met Ronald at his house and extracted the bullet, which was lodged in a plastic crossbeam between the backseat and trunk.

### (3) December 11, 2017 Shooting: Maria A.

On December 11, 2017, between 4:00 p.m. and 5:00 p.m., Maria A. was driving her Acura SUV home from work on Highway 180 near Howard Avenue when she heard a loud noise. She thought a tire had blown, or that someone had thrown a rock at her car. Then she felt air coming through her rear window. Maria believed that, just when she heard the loud bang, a dark-colored vehicle that was larger than her own went by.

Maria drove home and found that the rear driver's side window of her car was shattered, with the glass scattered in the backseat of her car. Her husband had the window repaired the next day.

A few days later, Maria noticed a piece of a bullet as she removed groceries from the backseat of her car. She reported the finding and sheriff's deputies examined her car. The deputies collected two bullet fragments, one on the backseat and one on the floorboard. The deputies also observed a hole in the backseat of her car, cut open the backseat, and collected a bullet fragment lodged in it.

4.

*(4)     December 11, 2017 Shooting:  Robert T.*

At approximately 4:45 p.m. on December 11, 2017, Robert T. was driving his Ford F-250 pickup truck westbound on Jenson Avenue near its intersection with Dickenson.  He noticed a red car, followed by a lifted black pickup truck with mud terrain tires.  As the truck passed Robert, he heard a loud bang.  Initially he thought a tire had blown but, as none of his truck's warning signals activated, he pulled over to inspect it.  He found a hole in the top of the vinyl truck bed cover.  He also saw a hole in the plastic lining of the tailgate, as well as damage to a trampoline and generator he was transporting in the back of the truck.  Robert called 911 to report the shooting; he noted that the driver of a black truck had shot at him.

Sheriff's deputies examined Robert's truck and took photographs of the damage; they were unable to access the interior of the tailgate to check for a bullet.  Two months later, Robert called the sheriff's department to report that a bullet had fallen out of his truck's tailgate onto the bumper.  Law enforcement officers collected the bullet.

*(5)     December 15, 2017 Shooting:  Paul M.*

On December 15, 2017, between 6:30 a.m. and 7:00 a.m., Paul M. was driving his Chevy Silverado pickup truck to work; he was headed southbound on Dickenson Avenue, off Highway 180.  As a dark-colored pickup passed him, Paul heard a loud bang.  Initially he thought a tire on either his truck or the other truck had blown.  After driving another half mile, he pulled over to the side of the road, to inspect his tires.  Seeing no damage on his tires, he continued on to work.  As he got out of his truck at work, he noticed a bullet hole in the "pillar" separating the windshield from the driver's side window, so he called 911.  Sheriff's deputies and a crime scene investigator recovered a bullet from Paul's truck.

**B.     January 8, 2018:  Gracia Arrested After Brandishing a Gun**

On January 8, 2018, Hector Villarreal, an off-duty correctional officer with the California Department of Corrections and Rehabilitation, was shopping at a Walmart in

Kerman (off Highway 180) with his family, around 11 p.m. Gracia was at the Walmart too; footage from Walmart's surveillance cameras showed Gracia, who was driving a black truck that day, had parked next to Villarreal's Ford F-150 truck in the Walmart parking lot. Villarreal did not take note of the black truck in the parking lot.

Villarreal and his family left the Walmart after purchasing some items. Surveillance footage showed Villarreal pulled out very shortly after the black truck parked next to him pulled out. Villarreal drove out of the parking lot and stopped at a red light before turning onto Highway 180; at that point, he noticed a black truck in front of him. The black truck was a Chevy Silverado with rugged, off-road tires. The black truck and Villarreal both turned onto Highway 180, heading in the same direction. The black truck moved into the slow lane, while Villarreal got into the fast lane and passed the black truck. The black truck began to drive aggressively, speeding up to get back ahead of Villarreal's truck, then slowing down and falling behind Villarreal, only to speed up and go past Villarreal again. The black truck then slowed down again and as Villarreal pulled up next to him, the driver of the black truck lowered his window and pulled out a gun. He was holding the gun in his left hand; the gun was fully outside the truck. Villarreal was "able to identify a black, semi-automatic handgun." Villarreal also saw a "[f]rontal view" of the driver's face. The driver of the black truck was later identified as Gracia; Villarreal also identified Gracia in court.

The prosecutor asked Villarreal, "How far from the gun would you say you were?" Villarreal answered, "[A]nywhere from six to eight feet." Villarreal explained: "It was across the rest of my truck. So it was me, my daughter, my brother, and then him and his truck next to [mine]." Asked where the gun was pointing, Villarreal said: "It was pointing at me. My vehicle. My family." Scared that the driver of the truck would shoot, Villarreal told his family to get down. Villarreal slowed down and veered over to the left, as a left-turn lane was coming up ahead, at an intersection with a traffic signal. When Villarreal reached the intersection, the light was red; Villarreal stopped in the left-

turn lane. Villarreal explained what happened next: "As I came up to that stop light, I thought [the driver of the black truck] was going to go straight on the 180 heading west. He braked abruptly. He stopped suddenly, and he got behind me."

When the light turned green, Villarreal turned left onto Highway 145, and drove to a Fastrip gas station that was about a quarter of a mile down the road; the black truck followed him to that location. Villarreal and the black truck entered the gas station via different entrances. Villarreal parked and got out, with his off-duty weapon drawn; he told his family to call the police, which they did. The black truck parked some distance away, by the convenience store. Villarreal determined there was one person in the black truck, in the driver's seat. At that point Villarreal himself called the police and identified himself as an off-duty peace officer; three police vehicles arrived within a minute of his call. Gracia was arrested and taken into custody without incident.

As Gracia was walked to a patrol vehicle, he told officers he had a pipe in his jacket pocket; the pipe was found to contain methamphetamine residue. Once Gracia was seated in the patrol car, he was read his *Miranda* rights, which he waived. Gracia stated that he believed Villarreal was following him, so he pulled up next to Villarreal's truck, rolled down his window, held a pistol out of the window, and pointed the pistol at the other truck in an attempt to make it go away.

During a search of Gracia's truck, police found a semiautomatic handgun in the driver's door pocket. Methamphetamine and marijuana was found in the truck's center console Gracia's truck was impounded.

C.     **Additional Police Investigation**

Fresno County Sheriff's Detectives Jose Diaz and Ervin Mathis took over the investigation. They interrogated Gracia at the police station on the night of his arrest; the interrogation was recorded and played for the jury at trial. Gracia admitted he brandished a firearm at Villarreal; he also acknowledged he was a convicted felon and prohibited from owning firearms. He said he had purchased the handgun at issue, which was a .380-

caliber weapon, approximately two months earlier for about $100, and that he had last fired it on the Fourth of July.  He denied owning any firearms other than the handgun found in his truck.  He also denied any involvement in the series of shootings in the area.

Gracia's home was searched the next day.  During the search, officers found a .30-caliber rifle, two types of ammunition rounds (.30-caliber and 30-caliber), as well as .40-millimeter handgun rounds.

Police obtained all the data from Gracia's cell phone.  Among the photographs on the phone was one depicting a hand holding a handgun that looked similar to the handgun found in Gracia'a truck; the photograph was taken on June 30, 2017.

Police obtained cell phone records from Gracia's cellular provider, in order to ascertain the location of Gracia's phone when the shootings at vehicles in the area had occurred.  The police also obtained cell phone records for Patricia M., Ronald B., Maria A., Robert T., and Paul M.—whose vehicles were shot at in the months before Gracia's arrest.

Hector Luna, an FBI agent, analyzed the cell phone records to determine the location of Gracia's cell phone relative to the cell phones of the shooting victims at the times the shootings occurred.  Luna opined that Gracia's cell phone was in the general vicinity of each shooting when it took place.

A ballistics expert determined that the bullets recovered from the victims' vehicles were all shot from the gun that officers found in Gracia's truck.  The expert also determined that the handgun found in Gracia's truck was a fully functional semiautomatic firearm.

An identification technician for the sheriff's department used a gunshot residue kit to collect swab samples from the interior of Gracia's truck, including from the driver's door and the driver's seat.  A criminalist examined the swabs and determined that gunshot residue was present in the truck's interior, including on the driver's seat.

**D.    Evidence of Uncharged Acts**

   *1.    November 20, 2017:  Uncharged Gun Brandishing Incident*

On November 20, 2017, at approximately 4:00 p.m., Ray L., who was driving his work van (a "gray nondescript van" with government plates), turned on to one of two southbound lanes of Highway 99, from Madera Avenue in Madera.  Ray explained:  "I got on in the slow lane.  About hundred yards after I was in the slow lane a black pick-up truck came by me and then got around in front of me.  I assumed he was getting off at the next exit, and I proceeded to move over into the fast lane to speed up with traffic."  Ray described the truck:  "It was [a] black or a dark colored Chevy Silverado, lifted up a little bit.  Had some mud and snow tires on it."  The black truck did not get off at the next exit; rather its driver "maintain[ed] his course."

Ray continued:  "I wasn't paying attention to him till his window came down in his truck.  He wasn't doing anything out of the ordinary that caused me to pay attention to him.  [¶] … [¶]  As I passed by – I tend to look around me just to make sure nothing odd is happening.  It's just a habit.  And as I was coming up I noticed his window started to come down, so that drew my eye towards his truck.  [¶] … [¶]  And then, I see the end of a pistol coming out of the window pointing at me, shaking it to make sure I noticed it's there.  At that point I let up on my gas and just coasted back.  [¶] … [¶]  And as soon as I started backing up he put his window back up again."  Ray had been a small arms specialist in the Navy; he had also worked at numerous gun shops (repairing guns) after he left the Navy.  He was able to identify the gun as a semiautomatic weapon; the gun was a "darker color," not a "stainless" weapon.  Ray pulled in behind the truck and called 911.  The truck exited the highway at Avenue 12, while Ray continued southbound on Highway 99.  Ray also reported the truck's license plate number to the 911 dispatcher.

The truck had a "legacy plate"; it was black with yellow lettering, and the license plate number was 1GRACIA.[3]

A few weeks later, Ray followed up with a friend of his at the Madera County Sheriff's Office, again providing the license plate number of the black truck. Through the friend's efforts, the information was relayed to the Fresno County Sheriff's Office.

### 2. *November 27, 2017: Uncharged Shooting Incident*

On November 27, 2017, between 6:20 a.m. and 7:00 a.m., Patricia P. and a coworker were driving south on Highway 145 in Patricia's Toyota Camry. They were heading from Madera to a school in Five Points, where they worked. Suddenly, as they were nearing Avenue 9½, they heard a loud bang. They assumed it was a rock and kept driving. When the bang occurred, a burgundy truck and a car had just gone by. When they got to work, Patricia saw a hole in the rear driver's side door of her car. The principal of her school and others determined it was a bullet hole and the principal contacted local law enforcement. The hole went right through the door, reflecting a bullet trail that continued to the car's trunk. Subsequently, officers from the Fresno County Sheriff's Office examined Patricia's car and collected a bullet from her trunk; it appeared the bullet had traveled through the door and a side-panel of the backseat and into the trunk. The bullet was later determined to have been fired from the handgun recovered from Gracia's truck.

### E. Prior Felony Conviction

The parties stipulated that Gracia had a prior felony conviction (as relevant to the felon-in-possession charges).

### F. Gracia's Testimony

Gracia admitted to brandishing a gun at Villarreal. He also admitted to possessing methamphetamine when he was arrested. He denied being involved in any other

---

[3] Ray reported the license plate number as 1GARCIA.

brandishing offense and any of the shootings. He testified he had found the semiautomatic handgun recovered from his truck, in Sanger, by a cemetery near his sister's house, on December 30, 2017. He said he told the police he had purchased the gun because he was facing only a brandishing charge at the time and did not think the origin of the gun was an issue. He testified that when he told the police he had last fired the gun on the Fourth of July, he meant to say he had last fired the gun on New Year's Eve. Gracia also noted that the picture on his phone of a hand holding a gun was of a coworker holding some other gun.

## DISCUSSION

### I.  *Gracia's Marsden Motion Following the Trial*

After trial, and prior to sentencing, Gracia sent a letter to the trial court requesting a new trial on grounds his trial counsel had rendered ineffective assistance of counsel. The court construed the letter as a *Marsden* motion based on Gracia's comments in court and held a *Marsden* hearing to determine whether to relieve Gracia's court-appointed attorney. The court ultimately denied Gracia's *Marsden* motion. Gracia now challenges that ruling, arguing the trial court erroneously denied his *Marsden* motion, thereby also denying him substitute counsel for purposes of filing a new trial motion on his behalf. He requests a remand for appointment of substitute counsel for purposes of preparing and filing a new trial motion. We reject Gracia's contention that the trial court's denial of his *Marsden* motion was erroneous, and affirm his convictions.

#### A.  **Applicable Law**

"The seminal case regarding the appointment of substitute counsel is *Marsden*, *supra*, 2 Cal.3d 118, which gave birth to the term of art, a '*Marsden* motion.' " (*People v. Smith* (1993) 6 Cal.4th 684, 690 (*Smith*).) *Marsden* held that a defendant has a right to substitute counsel on a proper showing that the constitutional right to counsel would otherwise be substantially impaired. (*Marsden*, *supra*, at p. 123; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 718.)

11.

"The legal principles governing a *Marsden* motion are well settled. ' " ' " ' " When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance." ' " ' " ' " (*People v. Johnson* (2018) 6 Cal.5th 541, 572, italics omitted.) "[I]f a defendant requests substitute counsel 'at any time during criminal proceedings,' the trial court must, under *Marsden*, 'give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney.' " (*Id*. at p. 573.) "[I]f the defendant makes a showing during a *Marsden* hearing that his right to counsel has been " 'substantially impaired' " [citation], substitute counsel must be appointed as attorney of record for all purposes. [Citation.]" (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.)

Substantial impairment is shown if " 'the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 599 (*Taylor*).) "Tactical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.' " (*People v. Welch* (1999) 20 Cal.4th 701, 728-729, overruled on other grounds by *People v. Blakely* (2000) 23 Cal.4th 82, 91.) And "[t]he mere ' "lack of trust in, or inability to get along with," ' counsel is not sufficient grounds for substitution." (*Taylor*, *supra*, 48 Cal.4th at p. 599.)

In the case of post-trial motions to substitute counsel to assist in filing a motion for a new trial based on ineffective assistance of trial counsel, "the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates

to matters that occurred outside the courtroom, and the defendant makes a 'colorable claim' of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial." (*People v. Diaz* (1992) 3 Cal.4th 495, 574.)

Where "[t]he court fully allowed defendant to state his complaints, then carefully inquired into them," and "[d]efense counsel responded point by point," reflecting an understanding of his or her duty as counsel and providing a reasonable explanation for his or her actions in the relevant context, "the court was 'entitled to accept counsel's explanation.' " (*Smith*, *supra*, 6 Cal.4th at p. 696.) We review the denial of a *Marsden* motion for abuse of discretion. (*Taylor*, *supra*, 48 Cal.4th at p. 599.) "Denial is not an abuse of discretion 'unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.' " (*Ibid.*)

## B.     Analysis

Gracia argues that he sufficiently demonstrated, at the *Marsden* hearing conducted by the court, that defense counsel had rendered ineffective assistance during his trial and, in turn, his right to counsel was substantially impaired, whereby the trial court's denial of his request for substitute counsel was erroneous.

### (1)     *Potential Testimony of Gracia's Girlfriend*

First, Gracia contends defense counsel was ineffective because she did not sufficiently develop his defense, as reflected in his testimony, that on December 30, 2017, he had fortuitously found, at a location in Sanger, the semiautomatic handgun that he brandished at Villarreal on January 8, 2018, and that was recovered from his truck upon his arrest that same day. In support of this contention, Gracia posits that his girlfriend, Alisa L., was with him when he found the gun near a cemetery in Sanger after the shootings at issue had occurred, and was ready to corroborate his testimony in this regard, but counsel failed to call Alisa as a witness.

13.

At the *Marsden* hearing, Gracia told the court: "I found the gun. I needed my girlfriend's testimony. She was here at the beginning of the trial ready to make herself available to my attorney … to testify on my behalf. And to me, she's – she was with me. When I asked [counsel] if she was going to do that, she hadn't been subpoenaed. [Counsel] said she wasn't going to bring her … And I needed her here as my witness because she knows everything."

The court questioned defense counsel in detail about her work on the case, including her failure to call Alisa as a witness at trial. Counsel explained that she made a tactical decision not to call Alisa to testify that she was with Gracia when he happened to find a handgun in Sanger. Counsel noted that the defense interviewed Alisa and an investigator went with Alisa to the cemetery where she said Gracia found the handgun. Counsel further explained that both Gracia and Alisa had made inconsistent statements regarding the gun. Gracia had told law enforcement officers during his interrogation that he had purchased the gun. Alisa had given inconsistent accounts to the police and to the defense regarding her knowledge of Gracia's possession of the gun and how he obtained it (her statement to law enforcement was audio recorded). In addition, some of Alisa's statements conflicted with certain statements made by Gracia, including statements made by Gracia that were not introduced at trial. Counsel concluded Alisa's testimony would not add value to the defense but, instead, would undermine it. Furthermore, the testimony of Ray L., at whom Gracia had brandished a dark, semiautomatic handgun on November 20, 2017, and who took down Gracia's license plate number, contradicted Alisa's potential testimony.

Under the circumstances, the court was entitled to credit counsel's explanation. (*People v. Dickey* (2005) 35 Cal.4th 884, 922 ["We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements."]; *People v. Turner* (1992) 7 Cal.App.4th 1214, 1219 [a defendant's disagreement with trial preparation and strategy is not grounds for substitution of counsel]; *People v. Rices* (2017) 4 Cal.5th 49,

69.) Accordingly, Gracia has not shown that counsel's failure to call Alisa as a witness substantially impaired his right to counsel.

### (2) *Police Tracker on Gracia's Truck and the Truck's "On Star" System*

Gracia next argues his trial counsel was ineffective because she failed to utilize location data from a tracker the police had placed on Gracia's truck on December 20, 2017 (after Ray provided the license plate number to authorities), as well as from a location-tracking system preinstalled in Gracia's truck. Gracia contends data from these sources would have shown he was actually in the location in Sanger where he said he found the phone (i.e., by a cemetery near his sister's house) at the relevant time.

Once again, the court carefully listened to Gracia's concerns and methodically questioned defense counsel on the issue. Defense counsel provided a specific and reasonable explanation as to why she did not present data from the police tracker on Gracia's truck or the truck's preinstalled location-tracking system to bolster Gracia's testimony that he had found the handgun in question in Sanger. As to the truck's own location tracking system, counsel noted that Gracia was evidently referring to the "On Star system," adding that Gracia himself had explained that the system was not actually activated during the relevant period. As to the police tracker, counsel explained it was placed on Gracia's truck after the shootings at issue in the case had concluded, so data from the tracker was not relevant in terms of identifying the location of Gracia's vehicle at the time of the shootings themselves.[4] Furthermore, as the court noted, even had the tracker data shown Gracia's truck was in Sanger when he said he found the gun by the cemetery there, it would not have corroborated Gracia's testimony that he found the gun

---

[4]  All the charged shooting and brandishing incidents, other than the brandishing at Hector Villarreal that led to Gracia's immediate arrest at the Fastrip, occurred during the period from November 27, 2017, to December 15, 2017. The police tracker was placed on Gracia's truck on December 20, 2018. And Gracia testified he found the gun in Sanger on December 30, 2017.

15.

there on that occasion.  Indeed, Gracia said his sister lived near that location in Sanger, so the fact that Gracia was in that location was not particularly probative by itself.  In sum, the court was entitled to accept counsel's explanations in these respects.

### *(3)  More Complete Investigation*

Finally, Gracia contends defense counsel was ineffective because she did not investigate miscellaneous other issues that would have supported his defense.  Gracia suggests counsel should have investigated cell phone data from his and Alisa's phones in case it revealed both of them were in Sanger on December 30, 2017, the date on which he says he found the gun by a cemetery there.  However, as the court suggested, evidence that both Gracia and Alisa were in Sanger on December 30, 2017, was not particularly probative of Gracia's claim that he found the gun by a cemetery there on that date.  Furthermore, counsel explained the defense had in fact retained a cell phone expert but decided against calling the expert to testify, because the expert's conclusions actually undermined the defense case and "bolstered" the prosecution's case.  Rather, counsel used the expert's suggestions to effectively cross-examine the prosecution's cell phone expert.

Gracia next suggests that the On Star system in his truck "may have shown his location at the time of the shooting incidents," thereby supporting his defense that he did not commit the shootings.  Gracia suggests counsel should therefore have further investigated this avenue as part of his defense.  However, as noted above, counsel explained that Gracia had informed his team that the On Star system in the truck was not activated during the relevant period.

Gracia also suggests that counsel should have further investigated the origins of the photograph of a hand holding a gun that was found on Gracia's cell phone.  The photograph was taken on June 2017, six months before Gracia said he found the gun in Sanger.  After Gracia was arrested and booked into jail in the instant matter, he told his girlfriend, during a phone call from jail, to delete a photograph on his phone that shows

16.

him holding something as he was concerned about the date stamp related to it. There is no indication of any feasible way for defense counsel to connect the photograph of the hand holding a gun that was found on Gracia's phone with another person. Gracia has not shown defense counsel's investigation was deficient and substantially impaired his right to counsel.

### (4) Conclusion

We conclude Gracia did not show, at the *Marsden* hearing, that his right to counsel was, or would be, substantially impaired, requiring the appointment of substitute counsel to represent him for purposes of new trial motion. Accordingly, the trial court properly denied his *Marsden* motion. We therefore decline to remand the matter for appointment of substitute counsel for purposes of preparing and filing a new trial motion on Gracia's behalf.

## II. Gracia's Romero *Motion*

Gracia's instant offenses occurred in late 2017 and early 2018. He was convicted of the charges in October 2018. Gracia filed a *Romero* motion in connection with his sentencing, requesting the court to strike one or both of his prior strike convictions under section 1385. (See *Romero, supra,* 13 Cal.4th 497.) The court denied the motion and Gracia now challenges that ruling, arguing the court's failure to strike "at least one of the two prior [strike] convictions" constituted an abuse its discretion. We affirm.

*Romero* confirmed that, under the Three Strikes scheme, the trial court retains the discretion to dismiss or strike one or more of the defendant's prior serious or violent felony convictions, alleged as a recidivist enhancement under the scheme. (*Romero*, *supra*, 13 Cal.4th at pp. 504, 529-530.) More specifically, *Romero* clarified the court may strike prior "strike" convictions pursuant to section 1385, "in furtherance of justice." (§ 1385; *Romero*, *supra*, at p. 531.)

A request for such relief is commonly referred to as a *Romero* motion. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).) The trial court's ruling on a *Romero*

17.

motion is reviewed for abuse of discretion.  (*Carmony, supra*, at p. 375.)  Our Supreme Court has noted this standard of review is deferential but not "empty."  (*People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*).)  "Although variously phrased in various decisions [citation], it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts.  [Citations.]"  (*Ibid.*)

*Williams* addressed the scope of the inquiry to be undertaken by the trial court in ruling on a *Romero* motion.  The touchstone of the *Romero* determination is whether "the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."  (*Williams, supra*, 17 Cal.4th at p. 161.)  *Williams* clarified that making this assessment requires "balanc[ing]" the defendant's "constitutional rights," including "the guaranties against disproportionate punishment of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution" on the one hand, and "society's legitimate interests," including "the fair prosecution of properly charged crimes," on the other hand.  (*Williams, supra*, at pp. 160-161.)

In striking the requisite balance, "preponderant weight must be accorded to factors intrinsic to the [Three Strikes] scheme, such as the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects."  (*Williams, supra*, 17 Cal.4th at p. 161; see *Romero, supra*, 13 Cal.4th at p. 531 [in exercising its discretion as to whether to strike a prior strike conviction, the court must consider the " 'defendant's background,' " " 'the nature of his present offenses, ' " and other " 'individualized considerations' "].)  " '[W]hen the balance falls clearly in favor of the defendant, a trial court not only may *but should* exercise the powers granted to him by the Legislature and grant a dismissal in the interests of justice.' "  (*Carmony, supra*, 33 Cal.4th at p. 375.)

18.

Gracia's two prior strike convictions were for rape of an intoxicated person (§ 261, subd. (a)(3)) and assault with intent to commit rape of an intoxicated person (§ 220), committed in 1997 and 1999 respectively. Gracia was sentenced to 17 years in prison in 1999, for the second offense. After his release from prison, he committed, in 2012, the misdemeanor offenses of driving under the influence of alcohol (DUI) and driving while his license was suspended or revoked for DUI. (Veh. Code, §§ 23152, subd. (b), 14601.2, subd. (a).) In 2013, he committed the additional misdemeanors of driving while his license was suspended or revoked for DUI and driving while in possession of an open container of alcohol. (Veh. Code, §§ 14601.2, subd. (a), 23222, subd. (a).) Gracia then committed the offenses charged in the instant case in 2017 and 2018.

In denying Gracia's *Romero* motion, the court stated that it had reviewed the files of Gracia's prior convictions. The court observed: "And sir, you have not shown any amount of rehabilitation for the Court to even believe that [section] 1385 is appropriate in this case. You have been incarcerated the majority of your adult life. You have not returned back into the community with [an] attitude of having to live a law-abiding lifestyle. And the time-frame between, obviously, you being released and [your other crimes] is very short." The court concluded: "[Y]ou fall squarely within the three strikes rules." The court then denied the *Romero* motion. We detect no abuse of discretion in the court's reasoning or ruling.

### III.   *Abstract of Judgment*

The People request the correction of a clerical error in the abstract of judgment with regard to the sentence on count 12. On count 12, brandishing a firearm, Gracia was sentenced to an indeterminate term of 25 years to life, with an additional five-year term for each of Gracia's two prior serious felony convictions. Thus, Gracia was sentenced on this count to an indeterminate term of 25 years to life plus a determinate term of 10 years. The abstract of judgment however erroneously reflects a single indeterminate sentence of 35 years to life. The trial court is directed to prepare an amended abstract of judgment

correcting this error and to forward it to the appropriate correctional authorities. (See *People v. Jones* (2012) 54 Cal.4th 1, 89 ["When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal."].)

## **DISPOSITION**

The judgment is affirmed. The trial court is directed to issue an amended abstract of judgment reflecting, as to count 12, that Gracia was sentenced to an indeterminate term of 25 years to life plus a determinate term of 10 years, and to forward the amended abstract to the appropriate correctional authorities.


SMITH, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


SNAUFFER, J.